**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**Wayne R. COOPER and Vincent**
**Gammill, Defendants–**
**Appellees.**

**No. 91–10380.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 8, 1992.

Decided Jan. 8, 1993.

929

Robert M. Twiss, Asst. U.S. Atty., Sacramento, CA, for plaintiff-appellant.

Robert M. Holley, Dwight M. Samuel, Sacramento, CA, for defendants-appellees.

Before: CHAMBERS *, SCHROEDER and BEEZER, Circuit Judges.

BEEZER, Circuit Judge:

Because of the government's bad faith actions, the laboratory equipment seized from Apotheosis Research lies broken and buried in a toxic waste dump. This equipment cannot be introduced at trial. It can neither support nor undermine Wayne Cooper and Vincent Gammill's repeated assertion that their lab lacked the physical capability to manufacture methamphetamine.

We consider here whether Cooper and Gammill have a comparable, alternative means to support their assertion of innocence. We conclude that no alternative matches the potentially powerful exculpatory evidence destroyed by the government. The appropriate remedy is dismissal of the indictment. Thus, we affirm the district court's judgment.

I

Vincent Gammill owned Apotheosis Research, a small chemical laboratory operating out of leased space. Wayne Cooper managed it. The two maintain that they ran a legitimate lab, making legal chemical products such as a fuel additive and naval jelly.

They say that the company obtained a contract to manufacture dextran sulfate and that Cooper configured the laboratory equipment to undertake that product's cool-reaction process. At the time, dextran sulfate was one of the most common underground AIDS treatments in the United States.

Cooper's parole officer visited the lab, which operated openly. While the Drug Enforcement Agency was conducting its investigation, the parole officer spoke to DEA Special Agent Richard Croslin about the lab's claim of legitimacy and Cooper's asserted involvement in dextran sulfate production. Apotheosis Research's landlord also reported to government investigators that the lab ostensibly made legitimate products, including dextran sulfate.

The DEA suspected Cooper and another man of participating in methamphetamine manufacture abroad. The agency obtained an arrest warrant for Cooper as well as a search warrant for the lab and Cooper's apartment. On December 7, 1988, DEA agents and a government chemist, Roger Ely, searched Apotheosis Research. They concluded that it was an operational methamphetamine lab.

The DEA agents found formulas for methamphetamine and substances used in its manufacture. Under a sink they found containers of sludge containing traces of methamphetamine.[1] The agents also found a patent for dextran sulfate, chemicals used to manufacture that substance, and materials relating to the production of naval jelly. The search of Cooper's apartment turned up nine pounds of ephedrine, which is used to manufacture methamphetamine, and some laboratory glassware. The agents found no traces of methamphetamine or precursor chemicals on any glassware or equipment.

---

* Judge Richard H. Chambers heard oral argument and voted at conference to affirm. Physical disability has prevented Judge Chambers from reviewing this opinion.

1. Cooper explains that the sludge was the result of cleaning out a second-hand pump. This pump was among the items destroyed. Cooper states that if the pump were available, he could prove that he had recently made it operational. Additionally, the serial number might allow the defense to establish that the pump had been salvaged from a drug lab seizure.

A DEA policy authorized the destruction of hazardous materials which agents discovered when dismantling clandestine labs. The policy aimed to protect both the agents and the environment. Agent Croslin, acting on Ely's recommendation, determined that most of the glassware and equipment should be seized and destroyed because it might be contaminated.[2] There was no determination of actual contamination. Pursuant to DEA policy, removal and destruction was assigned to American Environmental Management Corporation, a waste disposal company under contract to the DEA.

American Environmental put smashed glassware and smaller equipment in two 55–gallon drums. Among the large vats which American Environmental removed intact was a 125–gallon stainless steel reaction vessel. This vessel apparently functioned in a distillation process with a stainless steel vacuum tank. American Environmental stored the 55–gallon drums and the large vats on its property pending disposal. As the DEA knew, the company generally stored seized items for only a short time unless the government requested that the items be held as evidence. If requested to hold certain items, the company would set them aside for long-term storage.

When arrested, Cooper said that he used the lab equipment to manufacture naval jelly and dextran sulfate. On December 8, the day after Cooper's arrest and the seizure, Gammill, the owner of the lab, called Agent Croslin. He told Croslin that the equipment was configured to make dextran sulfate, it was expensive equipment, and he needed it back. As he had done previously, Croslin discussed this claim with his supervisor and with Ely, the chemist.

On December 12, Gammill's attorney called Croslin, reiterated Gammill's claims and demanded the return of the vats. He also stressed that the reaction vessel was critically engineered to make dextran sulfate and could not withstand the high temperatures required to make methamphet-

amine. Even though he knew the equipment would be destroyed, Croslin responded that it was being held as evidence. Croslin again discussed with his supervisor the claim that Apotheosis Research was a legitimate lab.

Although nothing suggested that the reaction vessel presented an imminent hazard, no one told American Environmental to preserve it for evidence or inspection. On December 21, the large vats, including the reaction vessel, were shipped to a toxic waste dump for burial. Five days later, the 55–gallon drums containing the glassware and smaller equipment were also shipped away for burial. In early January, Gammill's attorney wrote to Agent Croslin expressing hope that the government had completed its analysis of the equipment and requesting that it be returned. The assistant United States attorney handling the case responded in a letter dated January 12, 1989. The letter stated that the equipment—which had been shipped out and presumably buried—was being held as evidence.

The government charged Cooper and Gammill with conspiracy to manufacture methamphetamine and maintaining a place to manufacture methamphetamine. The two moved to dismiss the indictment, arguing that the government violated their due process rights by its bad faith destruction of potentially exculpatory evidence.

Judge Ramirez heard testimony on a variety of issues, including the potential exculpatory value of the reaction vessel. Cooper testified that the reaction vessel was made of low grade stainless steel and had seven rubber gaskets. A defense expert agreed that if this description were true, the high temperatures required for methamphetamine manufacture would destroy the vat and the seals. Additionally, the defense questioned whether the attached heating element and vacuum system would be adequate for methamphetamine manufacture. The defense expert also testified that he could reach no firm conclusions without examining the equipment.

---

**2.** Because the government does not challenge the bad faith determination, we do not address whether Croslin followed the DEA policy or whether it was a bad faith policy.

A government witness testified that he had designed this specific vessel while working for the Navy in the early 1960s. He had specified a high grade stainless steel and no rubber gaskets. He did not know, however, if the vessel was made to specifications or if it had been altered in the subsequent decades.

Shortly before he retired from the bench, Judge Ramirez denied the motion to dismiss. Cooper and Gammill moved for reconsideration. Judge MacBride, who took over the case, conducted an additional hearing and heard supplemental arguments. Judge MacBride granted the motion and dismissed the indictment. We have jurisdiction over the government's timely appeal.

## II

■ We review de novo the district court's determination that the government's failure to preserve potentially exculpatory evidence violated Cooper and Gammill's due process rights. *Paradis v. Arave*, 954 F.2d 1483, 1488 (9th Cir.1992).

## III

The government challenges the district court's determination that Cooper and Gammill could not reasonably obtain evidence comparable in value to the destroyed laboratory equipment. The government does not challenge the district court's finding that the equipment's potential exculpatory value was apparent before its destruction. The government also leaves unchallenged the district court's conclusion that the police acted in bad faith by allowing the equipment to be destroyed while assuring Gammill and his attorney that it was being held as evidence.

■ Two Supreme Court cases set out the test we apply to determine when the government's failure to preserve evidence rises to the level of a due process violation. In *California v. Trombetta*, 467 U.S. 479, 489, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413 (1984), the Court held that the government violates the defendant's right to due process if the unavailable evidence possessed "exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." In *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988), the Court added the additional requirement that the defendant demonstrate that the police acted in bad faith in failing to preserve the potentially useful evidence. *See also Paradis* 954 F.2d at 1488 (explaining *Trombetta* and *Youngblood* test).

*Youngblood*'s bad faith requirement dovetails with the first part of the *Trombetta* test: that the exculpatory value of the evidence be apparent before its destruction. *Trombetta*, 467 U.S. at 489, 104 S.Ct. at 2534. The presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed. *Youngblood*, 488 U.S. at 56–57 n. *, 109 S.Ct. at 336–337 n. *.

■ The equipment's value as potentially exculpatory evidence was repeatedly suggested to government agents. During the pre-seizure investigation, Cooper's parole officer and the lab's landlord reported Apotheosis Research's claims of legitimacy. Agents involved in the search knew that the lab was ostensibly configured to make dextran sulfate. In conversations following the seizure, agents repeatedly confronted claims that the equipment was specially configured for legitimate chemical processes and was structurally incapable of methamphetamine manufacture. In response to defense requests for return of the equipment, government agents stated that they held it as evidence. This statement was repeated even after the equipment had been destroyed. The equipment's exculpatory value was apparent to government agents before they, in bad faith, allowed its destruction.

The government's argument focuses on the second part of the *Trombetta* test. The government contends that Cooper and Gammill would be able "to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 489, 104

S.Ct. at 2534. In *Trombetta*, a drunk driving case, the arresting officers failed to preserve the defendant's breath sample. Analysis of the sample by a device used to measure the concentration of alcohol in a person's blood had concluded that the defendant had been intoxicated. The Court held that although the breath sample was unavailable, the defendant had a reasonably available, comparable means to challenge the validity of the test results. Experts could examine the device, testify about its reliability, and question whether the operator erred in administering the test. *Id.* at 489–90, 104 S.Ct. at 2534.

The government here suggests that Cooper and Gammill have other means to establish the physical capabilities of the destroyed lab equipment. They could question experts familiar with the properties of lab equipment and they could question the designer of the 125–gallon reaction vessel. Alternatively, Cooper and Gammill could accept a jury instruction giving them the benefit of any doubt.

General testimony about the possible nature of the destroyed equipment would be an inadequate substitute for testimony informed by its examination. The designer of the reaction vessel testified that he specified a grade of metal that would withstand high temperatures and did not specify rubber gaskets. The government presents no evidence, however, that the tank was built to the specifications. Furthermore, Copper and Gammill have maintained that after the tank was purchased in second-hand condition, Cooper reconfigured it to facilitate dextran sulfate's cool-reaction process. The issue is not the 1963 design, but the 1989 condition.

Cooper and Gammill's expert testified that if their description of the reaction vessel were accurate, it could not manufacture methamphetamine. He also testified, however, that to make a firm determination about the reaction vessel's capabilities he would need to examine it. He would also need to examine the vacuum pump, cooling system and other equipment whose properties Cooper and Gammill say support their claim of innocence. The pictures taken during the seizure were inadequate to assess the capabilities of the reaction vessel or the other equipment.

The government's proposed jury instruction similarly pales in comparison to the potential value of the actual equipment. The district court examined the possibility of instructing the jury members that "they were to take as proven the defendants' claim that the laboratory was a legitimate laboratory set up to manufacture dextran sulfate." The court appropriately rejected such an instruction. It would cheat Cooper and Gammill out of the opportunity to establish the weight of their claim to innocence. If the equipment were structurally incapable of methamphetamine manufacture and if the equipment was specially configured for legitimate procedures, that would be powerful, weighty evidence. The proposed jury instruction is not of comparable substance. The proposed instruction also fails to address the defense assertion that the traces of methamphetamine found in the sludge came not from manufacturing the drug but rather from cleaning its remnants out of a second-hand pump.

The government has not suggested any reasonably available evidence which would be comparable to the destroyed lab equipment. This is not a case like *Trombetta* where a machine's conclusions can be tested by questioning the reliability of the machine and its operator. Here, there is no adequate substitute for the laboratory equipment. Cooper and Gammill have no comparable, alternative means of defending themselves against testimony by government witnesses about the lab. The district court did not err in finding that the government's bad faith failure to preserve this potentially exculpatory evidence violated Cooper and Gammill's due process rights.

## IV

■ The government finally argues that even if Cooper and Gammill were unable to obtain comparable evidence from other reasonably available sources, the appropriate remedy is suppression of the evidence, not dismissal of the indictment. The case

would survive because the government has other evidence tending to support the methamphetamine charges. To establish a conspiracy to manufacture methamphetamine, the government is prepared to allege a number of acts that do not directly relate to the lab.

The government suggests that their proposed stipulation would remove any potential prejudice from the lack of the equipment. "The United States is prepared to stipulate that the defendants were engaged in the legitimate manufacture of dextran sulfate, naval jelly and other legitimate chemicals. The United States is also prepared to stipulate that the equipment that was destroyed could not have been used to manufacture methamphetamine or P–2–P [a methamphetamine precursor]." This, the government argues, puts the defendants in a better position than they would have been if the equipment had not been destroyed.

The government postulates that if the equipment were available, there would be a battle of the experts. The jury might then accept the government expert's opinion that the equipment could be used to manufacture methamphetamine. The first flaw in this reasoning is the assumption that a government expert who examined the equipment would necessarily testify that it could be used for methamphetamine manufacture. The second flaw is the failure to account for the power of physical evidence that the lab was configured for legitimate products.

Cooper and Gammill might be lying; weighty, exculpatory evidence might never have existed. If it did not exist, the stipulation certainly would put them in a better position. If it did exist, however, the stipulation likely would put them in a worse position. We will not adopt the government's belief that they are lying. The defendants' version of the facts, which was repeatedly relayed to government agents, had at least a ring of credibility. They should not be made to suffer because government agents discounted their version and, in bad faith, allowed its proof, or its

disproof, to be buried in a toxic waste dump.

The government's proposed stipulation is an inadequate substitute for the laboratory equipment. The district court appropriately dismissed the indictment.

V

The district court's judgment is AFFIRMED.