**UNITED STATES of America,**

v.

**Michael SEIBART.**

**No. 99–CR–658.**

United States District Court, E.D. Pennsylvania.

June 18, 2001.

Carol A. Sweeney, AUSA, Philadelphia, PA, for plaintiff.

Edson Bostic, Defenders Assoc. of Philadelphia, Philadelphia, PA, for defendant.

### MEMORANDUM and ORDER

ANITA B. BRODY, District Judge.

Michael Seibart is charged with possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). The one-count federal indictment arises out of a case investigated by the Philadelphia Police Department ("PPD") and initially

brought by the Philadelphia County District Attorney in the Pennsylvania Court of Common Pleas. The case was adopted by the United States Attorney as part of "Operation Cease Fire," an initiative that targets firearms offenders in local court systems for prosecution in federal court.[1]

The police found the firearm in a car, underneath the seat that Seibart had been occupying at the time they arrived on the scene. As the police did not see Seibart in actual possession of the gun, the government must prove that Seibart had constructive possession of the gun to convict him. Seibart contends that the gun belonged either to Aaron Carson, the other man in the car on the night of the arrest, or to an unknown person. Had the gun been preserved for fingerprint or blood testing, Seibart believes, it might have yielded evidence linking the gun to someone other than Seibart. Such evidence could have bolstered his defense against the possession charge.

Seibart has moved to dismiss the indictment or, in the alternative, to preclude the use of weapon evidence against him. Seibart argues that actions and inactions of the PPD violated his due process rights under the Fourteenth Amendment of the United States Constitution. Seibart claims that the PPD unlawfully destroyed potentially exculpatory fingerprint and blood evidence by mishandling and washing the firearm that forms the basis of the possession charge.

I conducted an extended series of hearings between May 31, 2000 and January 24, 2001. For the reasons set forth below, I will deny defendant's motion.[2]

## I.  FINDINGS OF FACT

### A.  The Arrest

On May 7, 1999, at 2:28 a.m., Philadelphia Police Officers Brian Boos and John Erickson received a radio call reporting drug sales activity at the corner of Boyer and Stafford Streets.[3] The report indicated that the drug activity involved four black males, all wearing black, and possibly occupying a white Ford Escort. At the time of their response, the officers were in uniform and assigned to an emergency patrol wagon.

Within a few minutes of the call, the officers arrived at Boyer and Stafford

1. "Operation Cease Fire" is a joint endeavor of the United States Attorney's Office, the Philadelphia District Attorney's Office, the Philadelphia Police Department, and the Bureau of Alcohol, Tobacco and Firearms. According to a statement from the Office of the United States Attorney for the Eastern District of Pennsylvania, "[b]y prosecuting these cases in the federal system, the local and federal authorities hope to take advantage of a more certain and severe sentencing scheme, the pre-trial detention of federal defendants pending trial, and the swifter disposition of these cases in federal court." *See Operation Cease Fire,* <http://www.usao-edpa.com/Invest/cease.htm> (visited June 14, 2001).

2. The issuance of this opinion and its findings, however, may prompt the PPD to reexamine its policies and procedures for handling firearms. Particularly in cases

adopted by the United States Attorney to take advantage of the more certain and severe sentencing scheme available through the federal system, the government must insure that adequate police work supports every indictment.

3. My findings relating to the May 7, 1999 incident are largely based on the testimony of Boos and Erickson, the officers who responded to the call resulting in the arrest of Michael Seibart. Boos testified at the hearing on May 31, 2000. Erickson testified at the hearing on January 24, 2001. I found the testimony of both officers credible. Boos has been employed by the PPD since September of 1995, and has been assigned to the 14th District since February of 1996. His partner Erickson, also assigned to the 14th District, has been with the Department for more than 5 years.

Streets. They observed a white Ford Escort on the southeast corner. Two black males occupied the front seats of the white Ford Escort. The officers saw no one else in the area. Boos parked the patrol wagon approximately 15 feet from the front of the Ford Escort.

Both officers got out of the patrol wagon and walked around to the driver's side of the Ford Escort. Defendant Michael Seibart was sitting in the driver's seat. Another male, later identified as Aaron Carson, was sitting in the front passenger seat. As he approached the car, Boos detected the odor of marijuana. Once within a few feet of the driver's side window, which was open, both officers observed on the defendant's lap a small plastic bag containing a green leafy substance. Based on their experience, the officers believed that substance to be marijuana. Boos also noticed a bottle of beer between the defendant's legs. The car was on and the radio was playing.

Boos first asked Seibart for his driver's license and vehicle registration. Seibart presented neither. Boos then asked the defendant what he was doing at that location. Seibart told the officers that he was "chilling with a friend." Notes of Testimony ("N.T."), May 31, 2000, at 20. Boos asked the defendant to step out of the car. As Seibart stepped out, the small bag that the officers believed to contain marijuana fell to the ground. At this point, Boos moved Seibart toward the rear of the Ford Escort, and told him that he was under arrest for marijuana possession. Boos instructed Seibart to place his hands on the car. Boos then began to perform a patdown on Seibart.

At the same time, the person in the passenger seat, Aaron Carson, asked if the officers wanted him to get out of the car. Boos and Erickson said no. At that moment, Carson got out of the car and ran Northbound on Boyer Street. Boos observed Carson grabbing toward his left side waist area. Seibart told Boos: "He's got a gun. That's why he's running." N.T., May 31, 2000, at 23. Erickson pursued Carson.

Rather than completing the patdown, Boos decided to handcuff Seibart. When Boos had cuffed his left hand, Seibart said "we got to talk," and resisted Boos's attempts to cuff his right hand. N.T. May 31, 2000, at 24. Boos struggled to arrest and handcuff the defendant. In the course of the struggle, Boos used pepper spray. Boos eventually handcuffed and arrested Seibart at the corner of Boyer and Price streets, one block from the location of the white Ford Escort. Once Seibart was cuffed, Boos placed him in the back of a regular patrol car that had responded to his assist call. The struggle had occupied Boos for approximately five minutes. The Ford Escort, left unattended, was not under Boos's total observation for that five minutes.

After putting Seibart in the patrol car, Boos went back to the white Ford Escort to recover the bag believed to contain marijuana that had fallen to the ground when Seibart got out of the car. He also went back to get his tie, his glasses, his flashlight and his notebook. Boos found the Ford Escort unattended, with its driver's side door open. Through the open door, Boos saw a gun under the driver's seat. The rear sight and the grip of the gun were in plain view.

Boos recovered the gun and unloaded it. He unloaded the gun to make it safe. He found one round of ammunition in the chamber of the gun and ten rounds in the magazine. Boos did not wear gloves or take any special precautions while handling the gun. He had not been trained to take such precautions when recovering firearms from a crime scene. Boos no-

ticed that part of the gun was coated in a substance that appeared to be blood.

Upon returning to the patrol car where he had put Seibart, Boos learned that the other officers on the scene had not searched Seibart. Boos took Seibart out of the patrol car and performed a search. Boos found in Seibart's left back pants pocket one clear plastic bag containing a green leafy substance. Boos believed that substance to be marijuana.

On the day of his arrest, May 7, 1999, Seibart was charged with state firearms and narcotics violations.

## B. The Investigation: Detective Work

Detective Edward Davis was designated the "assigned investigator" for the Seibart case.[4] As the assigned investigator, Davis was responsible for deciding whether to order fingerprint or blood analysis on the gun that Boos recovered from underneath the driver's seat of the Ford Escort. Neither Boos nor Erickson had the authority to order tests on firearm evidence taken from a crime scene.

Erickson brought Davis the gun on the morning of May 7, 1999, shortly after Boos recovered it from the Ford Escort. Erickson did not transport it from the crime scene to Davis in any protective wrapping. PPD policy requires only that officers transport firearm evidence "as safely as possible." N.T., July 3, 2000, at 79. When Davis received the gun, he handled it in the process of checking to be sure that there was nothing in the magazine, the chamber, or the barrel. At this time, Davis observed a reddish substance on part of the firearm. He prepared the property receipt for the gun, noting on it in capital letters "BLOOD CONTAMINATED."

Shortly after receiving the gun from Erickson, at about 4:00 a.m. on the morning of the incident, Davis met with Officer Boos. In speaking with Boos about the incident, Davis learned that Seibart had told Boos in reference to Carson: "he's got a gun, that's why he's running." Davis already knew that Carson had been arrested after Erickson saw him discard a firearm at some distance from the white Ford Escort. Therefore, Davis connected Carson with the gun he discarded in flight, not the gun found under the seat where Seibart was sitting at the time of the police stop.

Davis handles approximately two cases per week that involve the recovery of a firearm. On the basis of his training and experience, Davis believes that it is very difficult to obtain fingerprints from a rough surface or a surface that has been touched by more than one person. Davis knew that the firearm recovered from under the driver's seat had been unloaded to make it safe. He knew that an officer had handled the surfaces on which fingerprints might have been found. Given the low likelihood of obtaining useful evidence from a firearm that more than one person has handled, Davis decided not to dust the gun for fingerprints or have it marked "guard for prints."

Davis does not routinely dust recovered firearms for fingerprints or request that the Crime Scene Unit do so. Davis certainly would not dust for prints in a case where the suspect was seen with the weapon in his hand, still had parts of the weapon on his person, was observed throwing away the weapon, confessed to possessing the weapon, or confessed to throwing the

---

4. Davis testified at hearings on June 30, 2000 and July 3, 2000. I found his testimony credible. Davis has been with the PPD since 1990, and was promoted to detective in 1996. Since his promotion, Davis has been stationed at the Northwest Detective Division.

weapon. Davis would dust for fingerprints, however, under the following limited circumstances: 1) if the firearm was recovered at some distance from a suspect seen running from the area; or 2) to confirm the identity of a suspect if the firearm was recovered some time after his apprehension or in a different location from the scene where it was allegedly used.

Davis did not believe that those limited circumstances applied to the Seibart case. Davis knew that the firearm had been recovered from under the seat where Seibart had been observed sitting. Davis was under the impression that Seibart had been arrested, following a struggle with Boos, at the location of the Ford Escort, at roughly the same time as when he was observed sitting in the driver's seat. Davis did not know that five minutes elapsed between the time when Seibart was observed sitting in the driver's seat of the Ford Escort and the time when Boos pulled the gun from under the driver's seat. He did not understand that Seibart had been arrested over a block from the car. He did not know that the car was left unattended during those minutes.

Had Davis known these facts, he testified, he would have attempted to recover latent fingerprints from the gun.

### C. The Investigation: Police Paperwork

During the early morning of May 7, 1999, Boos and Erickson prepared their Complaint or Incident Report, police form number 75–48 ("the 48"), which detailed the arrests of Seibart and Carson.[5] The 48 provides a brief, contemporaneous account of the important information pertaining to an incident or arrest.

The 48 submitted by the officers did not include several facts to which the officers later testified. The 48 did not indicate that Boos asked Seibart for his license and vehicle registration upon reaching the driver's side window. It did not include the fact that Seibart said he was "chilling with a friend" when asked what he was doing in the car. It made no mention of the odor of marijuana Boos detected as he approached the car. It said nothing about the fact that the gun taken from the car was in plain view when Boos first discovered it under the driver's seat. Nor did it mention the blood-like substance that Boos observed on the gun.

The 48, however, is not a patrol officer's last word on an arrest or incident. Boos and Erickson also prepared a memo for Detective Davis to assist him in filling out his Investigation Report, police form number 75–49 ("the 49"). That memo is intended to include more statements and facts to improve the detective's understanding of what went on during the incident. Officers also expect to have a chance to speak with the detective to fill in more details. The memo Boos and Erickson prepared for Davis did not add any of those facts left off the 48. In his conversation with Davis, Boos did indicate that the gun appeared to have blood on it.

On approximately May 8, 1999, Davis prepared the 49 for the Seibart arrest. The 49 is the assigned investigator's record of the important facts pertaining to an incident. At that time, Davis did not ask Boos to review the 49. Boos did not see the 49 until July 12, 1999, when Boos, Erickson and Davis attended a meeting with Special Assistant United States Attorney Carol Meehan Sweeney. The meeting was part of the process of federal

---

**5.** Erickson filled out the 48, as Boos had made a short visit to the hospital for treatment of the lingering effects of the pepper spray he used in the struggle to handcuff Seibart.

adoption of the case pursuant to Operation Cease Fire.

During that session with Sweeney, Boos remembered information about the incident that had not been included in the 49. Sweeney told Boos that he should amend the 49 to include that information. Boos added the following words in the margin of the 49: 1) "detect a note of marijuana as you approach;" 2) "rear sight and grips visible" and 3) "blood around sight." N.T., May 31, 2000, at 86–87.

Sweeney learned that there might be blood present on the gun during the meeting held on July 12, 1999. She instructed Officer Boos to add that observation to the 49, but did not request that the firearm be preserved and tested.

### D. The Investigation: Police Examination of the Firearm

On May 7, 1999, at 7:25 a.m., Boos submitted one Astra semi-automatic pistol to the Firearms Identification Unit ("FIU") of the PPD. This was the firearm recovered from underneath the driver's seat of the Ford Escort. The gun was assigned to Officer Bottomer for examination.[6] The Astra was one of over 100 firearms submitted weekly to the FIU.

As the firearm was not marked "guard for prints," it would be handled according to usual FIU procedures. It would not be sent to the Crime Scene Unit for fingerprint analysis absent an order from the assigned investigator. Only about ten per cent of the guns assigned to Bottomer are marked "guard for prints." Had the gun been marked for prints, Bottomer would have conducted his examination wearing latex gloves, and would have used extreme caution in handling the gun so as not to eliminate potential fingerprints. Then he would then have sent the firearm to the Crime Scene Unit for fingerprinting.

The firearm was marked "blood contaminated." As a result, a member of the FIU had put the firearm into a manila envelope and stapled the envelope shut. No one had requested that the chemistry laboratory conduct tests on the blood-like substance observed on the firearm.

On August 3, 1999, Special Assistant United States Attorney Sweeney called Bottomer to find out if he had completed his examination of the firearm. This was the first time that Bottomer had been contacted concerning the case. Sweeney told Bottomer that she wanted the job completed because she needed the firearm for a court proceeding. Sweeney told Bottomer that the federal authorities were thinking about taking the case.

Bottomer conducted his examination of the firearm on August 3, 1999, the day he received Sweeney's call. In the course of his examination, Bottomer found that the firearm had a small amount of reddish, rust-like substance in the crevices of its rear slide. He found that the rust-like substance came off when rubbed with a q-tip. Based on his observations of thousands of other firearms, Bottomer concluded that this substance was corrosion.

In his affidavit, Bottomer stated that had he believed the substance on the gun to be blood, he would have taken it to the chemistry laboratory for analysis. However, at the hearing on July 3, 2000, Bottomer testified that he had no authority to request blood analysis. In that testimony, Bottomer claimed that if there is no request for analysis of a firearm marked as blood contaminated, he construes the

---

**6.** Officer Ernest Bottomer testified at a hearing held on July 3, 2000. I found his testimony credible. Bottomer has been employed as an officer of the PPD since 1977. He has been with the Firearms Identification Unit ("FIU") of the force since November of 1990.

marking as a simple warning to take precautions with the suspect substance. "[W]hether it is or isn't blood, in my opinion," he testified, "I proceed to clean it off." N.T., July 3, 2000, at 29.

Bottomer regularly attempts to clean substances from the surface of a firearm under the following circumstances: if the substance obscures a portion of the firearm which he must scrutinize; if the substance is likely to get on his hands, and from there to his work area and his report; and if the firearm is not marked "guard for prints" or otherwise designated for blood or body fluid analysis.

In this case, Bottomer decided to clean the firearm. He did so by holding it over a sink, spraying it with isopropyl alcohol, and rubbing the surface of the firearm with a towel. Then he examined the firearm. In the comments section of FIU form 1, Bottomer observed what he found inside the barrel, where the firearm was manufactured, its importer, and what kind of cartridges came in with the firearm. He did not make any comment about the reddish substance that he washed off the gun, as he did not believe the corroded surface of the gun to be anything out of the ordinary.

Shortly after his examination of the gun, Bottomer had a second telephone conversation with Sweeney. She asked him if the gun had been submitted for latent fingerprint testing or blood analysis. Bottomer told her that there had been no such requests. Sweeney then asked if Bottomer had cleaned the gun. Bottomer told her that he had cleaned the gun for his own safety and that of others, and so that he would not contaminate his work area with grime or germs.

### E. Department Policy on the Handling and Preservation of Evidence

Lieutenant Mark Fisher has been the Chief of the Crime Scene Unit ("CSU") of the PPD since January of 1998.[7] He did not begin handling fingerprint evidence on a daily basis until joining the CSU as its chief in 1998. The CSU is responsible for the gathering, preservation and submission of evidence from crime scenes. The CSU is the only unit in the PPD that would examine an item of evidence for latent fingerprints. Fisher oversees the collection of evidence in the CSU and also personally processes evidence collection. Over the last two years, he has gathered latent fingerprint evidence from an object approximately 300 times.

In addition to processing evidence taken from crime scenes, members of the CSU also deal with evidence that detectives designate for fingerprint dusting and testing. That evidence may not come from a crime scene. Very few of those requests come from officers, as detectives generally handle investigations. Sometimes firearm evidence comes to the CSU via the FIU, if the firearm has been marked "dust for prints" or "guard for prints."

The policy of the CSU is to honor all police requests to test an item of evidence for fingerprints. The Unit has on occasion honored such a request from an assistant United States attorney, but it does not honor requests made strictly by defense attorneys. The Unit routinely refuses to test any item of evidence that does not come in marked "guard for prints." A defendant cannot get an item of evidence tested for fingerprints unless that item was previously marked "guard for prints"

---

**7.** Lieutenant Fisher testified at hearings held on May 31, 2000 and June 30, 2000. I found his testimony credible. Fisher has been with the Department since 1981, and a lieutenant since 1991.

by the detective assigned to the case. The CSU would comply with a court order to test an item for fingerprints that had not been marked "guard for prints."

Given the volume of jobs the PPD handles each year, the Unit is forced to be selective. It aims to test only those items from which prints might likely be obtained. Based on his own training and experience, Fisher believes that firearms are not likely to yield usable fingerprints. He has heard of instances in which a CSU technician did recover and identify a fingerprint from a firearm, but considers such occurrences quite rare. During his tenure as chief of the CSU, Fisher has never seen a technician take an identifiable fingerprint from a firearm.

The top priority of the CSU when dealing with a firearm at a crime scene is rendering the firearm safe—that is, emptying out the bullets. The integrity of fingerprint evidence on the firearm is secondary. Consistent with those priorities, PPD street officers are not trained to disarm a gun in a way that maintains the integrity of possible fingerprint evidence on a gun.

Other authorities, however, dispute the PPD conclusion that preserving firearms for fingerprinting is a difficult, futile exercise. From Robert Hazen, the former supervisor of the Latent Fingerprint Section of the Federal Bureau of Investigation ("F.B.I."), I learned that the F.B.I. routinely processes all firearms to determine if they bear latent prints, regardless of the circumstances surrounding their recovery.[8] Officers can be instructed to handle and protect firearm evidence for future fingerprint, blood, or ballistics examinations. F.B.I. agents are trained to handle a firearm with cloth gloves or a handkerchief, Hazen testified, and, whenever possible, to touch the firearm only on corrugated surfaces unlikely to bear fingerprints. Those procedures minimize the chance that the fingerprints of the agent will contaminate evidence on the surface of the firearm. The F.B.I. also trains its agents to transport firearms in fitted cardboard boxes or stapled envelopes to further protect fingerprint evidence. Once in police custody, Hazen testified, communication between units can help insure that surface evidence is not spoiled in the process of other examinations of the firearm. Clear, coordinated police procedures, therefore, can result in a higher percentage of successful fingerprint recoveries from firearms.

## II. CONCLUSIONS OF LAW

### A. Controlling Legal Principles

■ The United States Supreme Court has decided two cases that deal directly with the obligation of the state to preserve evidence that might prove helpful to a defendant in a criminal prosecution. *See Griffin v. Spratt,* 969 F.2d 16 (3d Cir.1992)(citing *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); *Arizona v. Youngblood* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988)). In *Trombetta,* the Court held that

---

**8.** At the hearing held on May 31, 2000, I heard the testimony of Robert J. Hazen, a self-employed consultant in the area of fingerprint examination and identification. I found his testimony credible and impressive. Hazen retired from employment with the F.B.I. in 1990, after over 40 years of service. From 1949 to 1963, Hazen worked in the unit that classifies, files and conducts searches on fingerprints. In late 1963, he joined the Latent Fingerprint Section, where he worked as a latent fingerprint examiner until the end of 1972, when he became the supervisor in charge of fingerprint instruction at the F.B.I. Academy. Hazen held the Academy position until February of 1984. From that time until his 1990 retirement, Hazen served as the supervisor in charge of the Latent Fingerprint Section.

the government violates a defendant's due process rights when it fails to preserve evidence that would likely play a significant role in his defense. To meet that standard of "constitutional materiality," the Court said, "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta,* 467 U.S. at 489, 104 S.Ct. 2528.

■ In *Youngblood,* the Court clarified the test established in *Trombetta,* assigning defendant the burden of showing bad faith on the part of the police who failed to preserve the potentially useful evidence. *Youngblood,* 488 U.S. at 58, 109 S.Ct. 333; *accord United States v. Deaner,* 1 F.3d 192, 200 (3d Cir.1993). Mere negligence on the part of the police, without any showing of bad faith, does not support a due process violation. *See Youngblood,* 488 U.S. at 58, 109 S.Ct. 333; *Deaner,* 1 F.3d at 201.

## B. Application

### 1. Constitutional Materiality

Seibart argues that the evidence on the firearm is constitutionally material according to the terms of the test outlined in *Trombetta* and refined in *Youngblood.* His contentions demand some discussion of the relevant law on materiality.

■ The first prong of the *Trombetta* test for constitutional materiality asks if the disputed evidence had apparent potential exculpatory value at the time it was destroyed or lost.[9] In *Trombetta,* a case which arose from several drunk driving prosecutions, the Court held that the Due Process Clause of the Fourteenth Amendment did not require the state to preserve breath samples in order to introduce at trial inculpatory results of breath analysis tests. *See Trombetta,* 467 U.S. at 491, 104 S.Ct. 2528. The Court concluded that the exculpatory value of the lost breath samples was minimal, as they had been tested and found inculpatory according to accurate, reliable procedures prior to their destruction. *See id.* at 489, 104 S.Ct. 2528. While conceiving of some chance that the samples, if preserved, might have contributed to respondents' defense, the Court found that chance too slim to translate into apparent potential exculpatory value the time the samples were destroyed. *See id.* at 488–89, 104 S.Ct. 2528. In *Trombetta,* the Court found no obligation to preserve for defendant's use evidence previously analyzed by the state.[10]

---

**9.** To satisfy the second prong of the *Trombetta* test for constitutional materiality, the evidence must be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. Seibart has a strong claim on this second prong. He no longer has reasonably available means of determining whose fingerprints and blood were on the firearm at the time of its recovery. He has no reasonably available means of proving that he did not possess the firearm found under the seat of the white Ford Escort. Carson might have testified on Seibart's behalf, but Carson has died. Even were he alive, it is doubtful that Carson would have been available to Seibart, as Carson was also charged with firearms

violations in connection with the events of May 7, 1999.

**10.** Three Third Circuit opinions interpreting *Trombetta* and *Youngblood* concern cases in which inculpatory or inconclusive testing had been conducted before the evidence was lost. In all three of those cases, the failure to preserve the evidence for further testing was not found to support a due process violation. *See Deaner,* 1 F.3d at 199 (failure to preserve marijuana previously weighed by the government found immaterial); *United States v. Boyd,* 961 F.2d 434, 436–37 (3d Cir.1992)(failure to preserve urine sample that was previously tested and discarded according to standard procedure not material); *United States v.*

*Youngblood* concerned facts more closely analogous to those in Seibart's case. In *Youngblood,* as in Seibart, the authorities destroyed the purportedly exculpatory evidence without conducting tests on the evidence. Respondent Youngblood had been convicted of child molestation, sexual assault, and kidnaping. *See Youngblood,* 488 U.S. at 54, 109 S.Ct. 333. Youngblood argued that the prosecution violated his due process rights by failing to timely test or properly preserve blood and semen samples taken from the victim's body and clothes. *See id.* The Court, in upholding the conviction, commented that "the likelihood that the preserved materials would have enabled the defendant to exonerate himself appears to be greater than it was in *Trombetta.*" *Id.* at 56, 109 S.Ct. 333. However, the Court concluded that "[t]he failure of the police to refrigerate the clothing and to perform tests on the semen samples can at worst be described as negligent." *Id.* at 58, 109 S.Ct. 333. As there could be no violation of the Due Process Clause without a showing of bad faith, the Court did not make an explicit finding as to the materiality of the lost evidence. *See id.* at 56, 109 S.Ct. 333.[11]

Following the lead of the Court in *Youngblood,* I will make only general observations about the constitutional materiality of the destroyed firearm evidence and then will focus on whether it was destroyed in bad faith.

In general, the evidence supports the government's contention that the chances of recovering usable fingerprint evidence from a firearm are small, although the presence of blood may raise the probability of retrieving valuable evidence from the surface of a firearm. But the evidence also suggests that the PPD lacks policies and practices that provide personnel with guidelines as to what should be taken into account in deciding whether and how to preserve evidence on a firearm. Should the fact that the crime charged requires the government to prove constructive rather than actual possession of a firearm require particular evidentiary safeguards? If blood is found on the confiscated firearm, should that be a factor in the decision to preserve the evidence? Clear department guidelines should improve the conduct of officers at all levels of an investigation.

The impressive testimony of Robert Hazen persuaded me that it would be feasible to implement measures to improve the PPD's ability to recover and preserve surface evidence on firearms. According to Hazen, the supervisor of the Latent Fingerprint Section of the Federal Bureau of Investigation from 1984 to 1990, the F.B.I. completely processes each recovered firearm to determine if it bears latent fingerprints. The F.B.I. trains its agents to handle firearms in a way that minimizes

*Stevens,* 935 F.2d 1380, 1388 (3d Cir.1991)(potentially exculpatory saliva and semen evidence not destroyed in bad faith because government's inconclusive tests consumed the available sample).

11.  One Third Circuit case interpreting *Trombetta* and *Youngblood* concerns evidence which had not been tested prior to its destruction. *See Griffin v. Spratt,* 969 F.2d 16 (3d Cir.1992). Griffin, a prisoner, was found guilty of possession or consumption of intoxicating beverages in a prison disciplinary proceeding. The allegedly fermented beverage

found in his cell was not preserved or tested, but rather discarded according to standard prison procedure. *See Griffin,* 969 F.2d at 17 (citations omitted). The Third Circuit held that the destruction of the beverage would not have violated due process even if Griffin had been charged with a criminal offense rather than a prison violation. *See id.* at 21. The Third Circuit did not discuss the potential exculpatory value of the lost evidence, but rather based its holding on the absence of bad faith. *See id.*

interference with potential fingerprint evidence. Hazen also stressed the importance of communication between units of a police department to insure that surface evidence is not inadvertently eliminated in the course of other routine examinations of a firearm.

Limited resources may constrain the ability of the PPD to process every recovered firearm with such care. However, Hazen's testimony indicated that simple measures are possible if the Department chooses to issue guidelines that protect firearm evidence gathered under particularly sensitive circumstances.

Should the PPD instruct patrol officers like Boos and Erickson to take special precautions with firearm evidence not found on the suspect's person? Upon recovering the firearm from under the driver's seat of the white Ford Escort where he had observed Seibart sitting just minutes earlier, Boos drew the reasonable conclusion that evidence on the gun would, if anything, tend to inculpate Seibart. However, the gun was recovered from a car left open and unattended for five minutes; in addition, no parts of the gun were found on the defendant's person, and Seibart had told Boos that the other man in the car was carrying a weapon. Should such circumstances at a crime scene trigger heightened vigilance in evidence gathering? Should the Department teach patrol officers to routinely handle and transport a firearm in ways that protect the integrity of possible evidence on the surface of that firearm?

Should the PPD establish guidelines for the investigators who assess the potential value of evidence taken from a crime scene? Acting under clearer guidelines, Detective Davis might have realized the possible value of the firearm evidence in the Seibart case and taken steps to preserve it. As conducted, however, Davis's

investigation turned up little information about the crucial facts of Seibart's arrest. In his testimony on June, 30, 2000, Davis conveyed this misunderstanding of the facts:

> There is a struggle between Officer Boos and the defendant Seibart. He secures him, and he sees a gun in the car, and he retrieves the gun. There was no time lapse. The defendant was seen in the car, and the defendant was arrested right at the car there.

N.T., June 30, 2000, at 133. Given the inadequate reports prepared by Boos and Erickson—reports that omitted such material information as the fact that Seibart's arrest took place one block from the car, and that the gun was retrieved from a car left open and unattended for five minutes—Davis's understanding of the situation is no surprise. Had Davis been acting under guidelines that require a more rigorous investigation, however, he might have uncovered facts relevant to his decision to preserve the gun for fingerprint or blood tests.

Should the PPD grant examiners in the Firearms Identification Unit ("FIU") some authority to order fingerprint or blood analysis, or establish examination procedures that protect the integrity of surface evidence for later analysis? In his testimony, Officer Bottomer of the FIU revealed the lack of clear PPD guidance on how examiners should handle a gun marked for blood contamination. In his affidavit, which was received into evidence by stipulation, Bottomer stated that he would take a blood-contaminated gun to the chemistry lab for testing. During his testimony at the hearing, however, Bottomer said that he had no authority to arrange testing without a prior directive. Had he believed the reddish substance on the gun to be blood rather than rust, Bottomer testified, he still would have washed

the gun simply to keep germs out of his work area. That contradiction suggests the possible need for clearer guidance on the preservation of evidence in the FIU.

Should the PPD issue guidelines for when its Crime Scene Unit ("CSU") will honor a request to perform fingerprint analysis on a piece of evidence not marked "guard for prints" by the designated investigator? In his testimony, CSU Chief Lieutenant Fisher said that his Unit made a practice of refusing any request for fingerprinting that did not come from the investigator assigned to the case. Fisher indicated, however, that prosecution requests are sometimes honored, while defense requests are not honored unless made through a judge. Should the Department issue guidelines on access to firearms in custody to render this process more predictable and fair?

■ The policies for evidence gathering and preservation presently in place at the PPD seem to insure that firearms taken from all but the most sensitive crime scenes will have been handled carelessly by any number of people. Street officers are not expected to disarm a recovered weapon in a manner that minimizes interference with fingerprint evidence. Officers do not transport firearms from a crime scene in packaging that minimizes interference with surface evidence. Unless explicitly told to guard a weapon for prints, laboratory technicians and even detectives will go about their examinations of a firearm in a manner that guarantees spoilage of evidence. I will accept the government's contention that the Philadel-phia Police routinely handle firearms in ways that destroy evidence on the surfaces of firearms. That reality, however, should not absolve them of responsibility for assessing the apparent exculpatory value of what they destroy, and for putting into place guidelines that insure the preservation of evidence with potential exculpatory value.

## 2. Bad Faith

■ In missing evidence cases, it is the presence or absence of bad faith that will be dispositive. *See Youngblood,* 488 U.S. at 58, 109 S.Ct. 333; *United States v. Femia,* 9 F.3d 990, 994 (1st Cir.1993). If Seibart can demonstrate only negligence and not bad faith on the part of the police, there is no due process violation. The materiality of the destroyed evidence would not influence that outcome.[12]

■ To prevail on his motion, Seibart must show that the officers actually knew, at the time the firearm was mishandled, that they were destroying potentially exculpatory evidence. *See Youngblood,* 488 U.S. at 56, 109 S.Ct. 333, n. *. To show bad faith, Seibart must demonstrate that the PPD made a conscious effort to harm him or violate his rights. *See Trombetta,* 467 U.S. at 488, 104 S.Ct. 2528. Seibart has fallen far short of making such a showing. While the investigative procedures in this case might be described as negligent, the conduct of the officers in no way demonstrates bad faith of the kind required by *Trombetta* and *Youngblood.*

12. A finding of bad faith necessitates a finding that evidence had apparent exculpatory value at the time it was destroyed. *See, e.g. United States v. Cooper,* 983 F.2d 928, 931 (9th Cir.1992)(police acted in bad faith when they destroyed allegedly illicit laboratory equipment, as they knew at the time of the destruction that the equipment had potentially excul-patory value); *United States v. Elliott,* 83 F.Supp.2d 637, 647 (E.D.Va.1999)(bad faith to authorize the destruction of glassware allegedly used in methamphetamine manufacture without testing the residue on the glassware; evidence had apparent value at time of destruction).

### 3. Conclusion

As I do not find bad faith on the record before me, I will deny Seibart's motion to dismiss the indictment or, in the alternative, to preclude the use of weapon evidence against him.

**AND NOW**, this 18th day of June, 2001, it is **ORDERED** that Defendant Michael Seibart's Motion to Dismiss the Indictment and/or Preclude the Government's Use of Firearm Evidence (Docket Entry No. 26) is **DENIED**.