**UNITED STATES of America, Plaintiff,**

v.

**John VERA, Defendant.**

**No. CR.00–309–BR.**

United States District Court,
D. Oregon.

June 26, 2001.

Michael W. Mosman, United States Attorney, John Laing, Assistant United State Attorney, Portland, OR, for the United States.

Steven T. Wax, Federal Public Defender, Nancy Bergeson, Assistant Federal Public Defender, Portland, OR, for Defendant.

## OPINION AND ORDER

BROWN, District Judge.

This matter comes before the Court on Defendant's Motion to Dismiss Indictment Based on Destruction of Evidence (# 89). Defendant is charged in Count 2 of a Superseding Indictment with manufactur-ing methamphetamine. The government has filed a Notice of Enhanced Penalties based on drug quantity and Defendant's prior criminal history. If established, Defendant would be subject to a 20–year mandatory minimum sentence. For the reasons that follow, Defendant's Motion to Dismiss Indictment Based on Destruction of Evidence is **DENIED.**

### *FACTS*

The Court held evidentiary hearings in this matter on June 7, 2001, and June 19, 2001. After thoroughly weighing and evaluating the evidence, the Court finds the following facts by a preponderance of the evidence:

In a Fall 1995 drug investigation, deputies of the Clackamas County Sheriff's Office seized evidence from two drug labs, including methamphetamine samples from Defendant's residence at 16810 S.E. 120th Avenue in Clackamas, Oregon, and from the home of Co–Defendant Woody Morgan at 6937 S.E. 112th Avenue in Portland, Oregon. On October 25, 1995, a Clackamas County property control officer transported some of the evidence—16 samples of methamphetamine taken from Defendant's residence and 11 samples of methamphetamine taken from the other lab location—to the Oregon State Crime Lab for analysis. On May 24, 1996, the same property control officer retrieved all of the samples from the crime lab and returned them to the custody of the Clackamas County Sheriff's Office. This is the last documented contact with the samples.

Because the samples contained materials deemed to be hazardous, they could not be stored with other evidence in the property room. The samples were placed instead in a locked trailer where the Sheriff's Office maintained *all* hazardous materials, including both those of an evidentiary nature that were supposed to be kept and orga-

nized on the right side of the trailer, and those that were not evidence and supposed to be kept on the left side of the trailer. Only property control officers and the agency's hazardous materials technician had keys to the hazardous materials trailer.

Pursuant to Sheriff's Office policy, Property Officer Sandy King made periodic inquiry of the case agent, Deputy Alex Schwarz, to determine whether all of the evidence from this investigation should be maintained. Deputy Schwarz consistently responded to those requests in the affirmative and asserted this was a "very active" federal investigation.

In early 1998, Clackamas County Deputy Randy Oxford served as the agency's Hazardous Materials Technician. Because the hazardous materials trailer was by all accounts "a mess" and very disorganized, Deputy Oxford undertook an inventory and "housecleaning" of the trailer's contents. In March, 1998, he destroyed various materials that he assumed were eligible for disposal from "the left side" of the trailer. Sheriff's Office policy permits destruction of *evidence*, however, only after several steps have been taken to assure the evidence no longer is needed. These include obtaining the written approval of the investigating officer. Deputy Oxford made no effort in 1998 to verify with property control officers whether the materials from the left side of the trailer that he intended to destroy included any items of evidence. Neither Deputy Schwarz nor Property Officer King ever approved destruction of the methamphetamine samples in this case.

In May 2000, Deputy Schwarz learned these 27 samples could not be located. Several searches of the hazardous materials trailer, including one by Deputy

Schwarz with Deputy Oxford on May 24, 2000, were unsuccessful. Deputy Oxford told Deputy Schwarz he had destroyed the samples in the 1998 "housecleaning" of the hazardous materials trailer. Deputy Oxford also admitted to Officer King it was a "dumb mistake" not to have checked with her and Deputy Schwarz before destroying the evidence.[1] Deputy Oxford made some kind of written record on a yellow tablet of the items he destroyed at the time. Although Deputy Oxford had those notes during the May 2000 searches for the evidence, they, too, have disappeared.

Defendant was indicted in June, 2000. Defendant's counsel discovered in March 2001 that the samples were missing. This Motion followed her investigation. The Court concludes Deputy Oxford destroyed the samples in his March 1998 "housecleaning" of the hazardous materials trailer.

### DISCUSSION

■ In order to obtain dismissal of the Superseding Indictment based upon the government's destruction of evidence, Defendant must establish the following:

(1) the destroyed methamphetamine samples were "potentially" exculpatory;

(2) the destruction was done in bad faith; i.e., the government knew of the potentially exculpatory value of the samples when it destroyed them; and

(3) Defendant has no alternative means of proving his point. *See Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). *See also California v. Trombetta*, 467 U.S. 479, 489, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); *United States v. Cooper*, 983 F.2d 928, 930–31 (9th Cir.1993).

---

**1.** Deputy Oxford's hearing testimony, however, was less direct, and he currently maintains

he does not know whether he destroyed these samples.

Bad faith is shown when "the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." *Youngblood*, 488 U.S. at 58, 109 S.Ct. 333. It is undisputed that "mere negligence" is insufficient to establish bad faith. *See Youngblood*, 109 S.Ct. at 337. *See also United States v. Tercero*, 640 F.2d 190, 193 (9th Cir.), *cert. denied*, 449 U.S. 1084, 101 S.Ct. 871, 66 L.Ed.2d 809 (1980).[2] "Bad faith" in this context requires some showing of "connivance." *See United States v. Loud Hawk*, 628 F.2d 1139 (9th Cir.1979) (*en banc*), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1279, 63 L.Ed.2d 602 (1980). Compliance with departmental policy concerning the destruction of evidence is evidence of good faith. *See, e.g., United States v. Barton*, 995 F.2d 931, 936 (9th Cir.), *cert. denied*, 510 U.S. 957, 114 S.Ct. 413, 126 L.Ed.2d 359 (1993); *United States v. Heffington*, 952 F.2d 275, 280 (9th Cir.); *United States v. Westerdahl*, 945 F.2d 1083, 1084 (9th Cir.1991); *Mitchell v. Goldsmith*, 878 F.2d 319, 323 (9th Cir.1989).

The Court has found only two circuit court decisions in which the dismissal of an indictment was merited based on the defendant's success in establishing the government destroyed evidence in bad faith and no alternative means of proof existed. In *United States v. Cooper*, 983 F.2d 928 (9th Cir.1993), the defendants contended they were lawfully manufacturing a fuel additive, and the government's destruction of the entire lab deprived them of the ability to establish their defense. In that case, the government offered no excuse for its decision, and the destruction took place at a time when government investigators knew the nature of the defense and after defendants had made several requests for return of the equipment. *Id.* at 931 ("[T]he equipment's value as potentially exculpatory evidence was repeatedly suggested to government agents.").

The other circuit court decision in which an indictment was dismissed based upon the government's bad-faith destruction of evidence followed and was factually similar to *Cooper*. In *United States v. Bohl*, 25 F.3d 904 (10th Cir.1994), the defendants allegedly built substandard radio towers and were charged with fraud relative to government construction contracts. Prior to trial, the government destroyed the legs of the radio towers despite the defendants' repeated requests that the government preserve the towers. The key issue in the case was whether the towers conformed to contract specifications. The court noted the destruction took place at a time when there existed "substantial independent evidence that government tests (forming the basis for the indictment) may have been flawed." *Id.*

The activity giving rise to this prosecution took place nearly five years ago. Defendant claims he has been prejudiced from the delay in prosecution and the loss of the 27 methamphetamine samples seized from the two laboratory sites.[3] Defendant contends these samples would have shown a chemical composition relevant to drug quantity and the statutory mandatory minimum sentence. Moreover, Defendant asserts a comparison of samples taken from the two different lab sites might have demonstrated that the two labs produced different methamphetamine compositions by different chemical processes, and, there-

---

**2.** Whether bad faith is assessed against an objective or subjective standard remains an open question. *See United States v. Westerdahl*, 945 F.2d 1083, 1087 (9th Cir.1991) (the court noted *Youngblood* suggests an objective standard, but the court declined to reach the issue since defendant failed to establish bad faith under either an objective or subjective standard).

**3.** Other than these lost samples, however, Defendant identifies no specific form of prejudice arising from the delay in prosecution.

fore, the two labs could be unconnected contrary to the government's theory of the case. In its Trial Memorandum, the government alleges Defendant began a methamphetamine "cooking" process at his residence and then transferred the nearly-finished product from that process to Co–Defendant Woody Morgan's residence. The government denies the methamphetamine samples were lost and/or destroyed in bad faith. The government also contends the samples were not exculpatory or potentially exculpatory and, in any event sufficient evidence seized from the two sites and preserved for trial provide Defendant with an alternative means of proceeding with his theory that the two sites are unconnected.

■ To establish the potentially exculpatory value of the destroyed evidence, Defendant proffered expert testimony from Gene Gietzen, a "forensic consultant." Gietzen testified the lost samples could have been used to determine chemical composition and similarities or dissimilarities between samples taken from the two lab sites. Gietzen explained methamphetamine cooks can become "habitual" and use the same manufacturing method for all of their processes; thus, a "common cook" might be identified by looking at: (1) method, (2) precursor materials, (3) by-products, and (4) cutting agents. Gietzen examined the Oregon State Crime Lab analyses of the samples seized from the two lab sites and noted the precursor material from the 112th Avenue lab appeared to be ephedrine while the precursor material from the 120th Avenue site appeared to be pseudoephedrine. Gietzen testified further analysis of the samples could have revealed data concerning quantity, purity, and potential yield that might have distinguished one site from the other. Because the government alleges the two labs were involved in one continuous chemical process, Defendant contends proof that the processes were chemically distinct could be "potentially exculpatory," especially because drug quantities are particularly at issue. Defendant's showing, however, is speculative on this record and falls short of the standard required to show a due process violation.[4] Indeed, Defendant's forensic expert was able to testify about the potential differences between the two laboratory sites based upon Oregon State Crime Lab reports and precursors seized and maintained.

To show the government acted in bad faith, Defendant argues Deputy Oxford destroyed the evidence in reckless violation of federal and state law as well as Sheriff's Office policy. Despite Deputy Oxford's remark that certain departmental evidence policies did not apply to him because he was not a "property officer," there is no dispute that he failed to adhere to state, federal, and agency requirements when he destroyed the evidence. While Defendant cited only one decision in which a court's determination of bad faith destruction of evidence rested upon a finding of recklessness, *see United States v. Elliott,* 83 F.Supp.2d 637 (E.D.Va.1999), case law from the Supreme Court and the Ninth Circuit clearly requires a higher degree of *mens rea* than that suggested by Defendant: "[T]he presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed." *Cooper,* 983 F.2d at 931, (citing *Youngblood,* 109 S.Ct. 333). Accordingly, *Elliott* is not controlling, and, in any event, the *Elliott* court limited the remedy to the

---

**4.** If anything, like the destroyed breathalizer tests addressed in *Trombetta,* it is far more likely the methamphetamine samples lost in this case would have been inculpatory rather than exculpatory because they demonstrate the alleged lab was, in fact, operating successfully.

exclusion of certain evidence and did not dismiss the indictment on due process grounds. Further, although numerous cases permit an inference of good faith from evidence of compliance with departmental policies, no authority has been offered to support Defendant's assertion that the negative inference holds true; i.e., that failing to adhere to departmental policies constitutes evidence of bad faith.

Defendant also contends Deputy Oxford was evasive in his testimony, reluctant to accept responsibility for the destroyed evidence, and otherwise "not forthcoming" in his explanations about his conduct. Defendant asserts this bolsters his contention that the government acted in bad faith. The Court concludes, however, Deputy Oxford's attitude and demeanor on the witness stand are more readily explained by a desire to avoid focus for the blame after the fact and are not particularly probative of his mental state at the time he destroyed the samples.

The Court concurs that Deputy Oxford's actions were, at the least, negligent. While the evidence in this case might even rise to the level of gross negligence or recklessness in the context of civil torts, it falls short of the type of deliberate bad faith or "connivance" required under *Youngblood* and its progeny.

This case also presents a novel situation relative to Defendant's burden to establish bad faith. Defendant had not been indicted when the methamphetamine samples were destroyed. Thus, Defendant could not have put the government on notice of his interest in the samples or of any theory he might have had about their potential exculpatory value. In any event, there is no evidence in the record concerning any government awareness that these samples were potentially exculpatory unlike the situations in *Cooper* and *Bohl.* The Court finds, however, this factor alone does not justify the adoption of a lesser standard of *mens rea* than that set forth by the Supreme Court. In this case, there was no obvious exculpatory value to this evidence apparent to Deputy Oxford or to the government generally when it was destroyed.

Finally, although not ideal, Defendant has alternative sources of evidence to seek to prove his theory of the case. The potential exculpatory value of the remaining items of evidence has not been described for the Court. Indeed, Defendant's expert was not asked to evaluate that evidence. In the last analysis, the absence of the 27 samples and the circumstances under which they were destroyed more likely will work to the detriment of the government because the mishandling of this evidence implicates and undermines the overall weight of the case it brings.

The Court finds no evidence of actual bad faith: Oxford had no direct connection to this particular investigation, and there is no dispute that Schwarz and King did everything they could to ensure all evidence seized in this case was properly preserved. While the government is responsible for the serious mishandling of these evidentiary samples, no inference of bad faith is warranted on this record.

### CONCLUSION

Based on the foregoing, the Court finds Defendant has failed to establish the government destroyed potentially exculpatory evidence in bad faith. In light of alternative sources of proof available to Defendant, the Court also finds Defendant has failed to establish prejudice from the delay in prosecution. Accordingly, Defendant's Motion to Dismiss the Indictment Based on the Destruction of Evidence (# 89) is **DENIED.**

IT IS SO ORDERED.