Filed 12/4/13  P. v. Frank CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055531 |
| v. | (Super.Ct.No. SWF10002382) |
| WILBERT FRANK, JR., | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Jerry E. Johnson, Judge. (Retired judge of the Los Angles Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Raymond M. DiGuiseppe, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood, Meagan J. Beale and Ronald A. Jakob, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury found defendant and appellant Wilbert Frank, Jr., guilty of deliberate premeditated murder. (Pen. Code, § 187, subd. (a).)[1] In relation to the murder conviction, the jury found true the enhancement allegation that defendant personally and intentionally discharged a firearm proximately causing death to another person. (§§ 12022.53, subd. (d), 1192.7, subd. (c)(8).) Additionally, the jury found defendant guilty of willfully and unlawfully possessing a firearm within 10 years of a domestic violence conviction. (§ 243, subd. (e)(1).) (Former § 12021, subd. (c)(1) [eff. Jan. 2009].) The trial court sentenced defendant to prison for an indeterminate term of 50 years to life.

Defendant raises four issues on appeal. First, defendant contends the trial court erred by preventing defendant from presenting evidence reflecting he suffered from carbon monoxide poisoning at the time of the murder. Second, defendant asserts the trial court erred by not instructing the jury about the prosecution's failure to preserve a sample of defendant's blood that was taken at a hospital after the murder. Third, defendant contends the trial court erred by not instructing the jury on the law of provocation and heat of passion in relation to premeditation and deliberation. Fourth, defendant asserts the trial court erred by imposing restitution in the amount of $82,583.93 because the record does not support restitution in that amount. We affirm the judgment.

---

[1] All subsequent statutory references will be to the Penal Code unless otherwise indicated.

## FACTUAL AND PROCEDURAL HISTORY

A.  BACKGROUND

Defendant and Silvia Frank (the victim) were married for 18 years. Defendant and the victim shared five daughters, who were ages 18, 16, 14, 5, and 2 in December 2011.

On September 25, 2008, defendant arrived home smelling of alcohol. Defendant cornered his eldest daughter (Clarke)[2] in a bathroom and screamed at her. The victim used a shoe to "fight [defendant] off" of Clarke. Clarke hid in a closet with her sisters and called the police. Clarke could see defendant holding the victim in a headlock and punching the victim's face.

August 15 was the anniversary of the stillborn birth of defendant's and the victim's son. August 15 was a "rough" day for the family due to the anniversary. On August 15, 2010, defendant arrived home angry and smelling of alcohol. Defendant argued with the victim and Clarke for approximately one hour. Defendant began "swinging" at Clarke while she was holding one of her younger sisters in her arms. Defendant began fighting with Clarke's uncle. Someone called the police, but defendant drove away before the police arrived. When defendant returned home, he engaged in a physical altercation with the police.

Defendant and the victim separated on August 15, 2010; defendant moved out of the family home. Henry Munoz, whom defendant knew through their work in the

---

[2] First names are used for the sake of clarity due to people involved in the case sharing the same last name—no disrespect is intended.

3

financial services industry, helped defendant find a home to rent in Hemet. The home was built in 1978 and was approximately 1,750 square feet. The house was broken into multiple times, most likely by the tenants who lived in the house prior to defendant. Defendant feared for his life due to the repeated break-ins and told Munoz that he would need to move out of the house. In response, Munoz lent defendant a shotgun.

Munoz told defendant to leave the gun unloaded, keep the ammunition separate from the gun, and not to leave the gun in the house when defendant was not home due to the break-ins. Defendant took the shotgun and a box of ammunition. Around early or mid-October 2010, the break-ins at the property ended. Approximately one month later, in November 2010, Munoz began asking defendant to return the shotgun, but defendant did not return it at that time.

From November 10 to November 30, defendant and the victim exchanged a series of text messages. In the messages, defendant discussed his desire to reconcile with the victim, but she refused. Defendant also informed the victim that his "unemployment ran out" and he would not be paying child support. At one point, the victim told defendant to stop calling her because he had called 146 times. Defendant responded that if she answered the telephone then he would not have to call so many times. The victim refused to speak to defendant on the telephone. In mid-November, the victim began having a romantic relationship with Ronald Flores (Flores).

B.      NOVEMBER 30, 2010

On November 30, 2010, at 8:57 a.m., the victim sent a text message to defendant informing him she would be introducing Flores to the children that night. Defendant

4

asked if Flores would be coming to the family home, and the victim responded, "Yes." Defendant asked if the victim had been "cheating" on defendant with Flores via Facebook prior to the victim and defendant separating. The victim denied having an affair. Defendant asked if the victim thought their daughters would like Flores, and the victim responded, "Yes." Defendant asked the victim how serious her and Flores's relationship was and whether Flores was moving into the family home. The victim responded, "Not yet." At 9:09 a.m., defendant sent a text message to the victim reading, "Good luck & I wish you the very best."

As the text message conversation progressed, at 9:27 a.m., defendant wrote, "I would never disrespect you with having a woman in the house you built. But we have different views in the matter of respect in that area. You are free to do what you want . . . we're separated." At 3:23 p.m., defendant asked the victim to bring him his jacket, which was still at the family house. Defendant asked the victim to meet him at a restaurant. The victim agreed to meet defendant.

Clarke accompanied the victim to the restaurant. On the way to the restaurant, Clarke saw defendant's vehicle at a gas station. Clarke stopped her vehicle behind defendant's vehicle at the gas station. As defendant exited the restroom, the victim walked toward defendant with the jacket. Defendant waved at Clarke and the victim to follow him, and he entered his vehicle.

The victim, Clarke, and defendant arrived at the restaurant parking lot at the same time. The victim exited the car, while Clarke stayed in the car to read a text message. As Clarke was looking at her phone, she heard the victim say, "'Oh, my God,

5

Frank,'" and then she heard a gunshot. Clarke heard defendant say, "'That will teach you to fuck with me,'" and saw defendant holding a gun. Defendant returned to his vehicle, placed the gun inside it, and drove away.

Clarke told a person passing by to call the police. Clarke held the victim's hand, but the victim did not speak. The victim had been shot in her abdomen. Deputies arrived at the restaurant at 4:50 p.m. A paramedic could not find a pulse in the victim's forearm, but found a "very faint pulse" along her carotid artery. The victim's intestines were protruding from her body. The victim died at the hospital. The cause of the victim's death was a "[s]hotgun wound to the abdomen." The shot severed two major arteries causing the victim "to bleed significantly."

Defendant was arrested at 6:42 p.m. in Temecula. A detective found a handwritten will in defendant's vehicle. The will was dated November 30.

C.  DEFENSE

Defendant testified at trial. The following are the defense's version of the events. On September 25, 2008, defendant and Clarke were arguing in a bathroom because defendant made Clarke stop playing on a computer. Defendant pushed Clarke's head and said, "'Don't talk to me like that, Clarke.'" The victim entered the bathroom and struck defendant's shoulder with a shoe she was holding. Defendant placed the victim in a headlock, but let her go "[w]ithin seconds" when she "calmed down."

On August 15, 2010, defendant was drinking due to it being the anniversary of the stillborn birth of his son. Defendant argued with the victim. Defendant and the

6

victim agreed he would leave the house and return after the victim left to work her nightshift at the hospital, as a nurse. Defendant never struck the victim or his children. When defendant returned to the house law enforcement officers were there and defendant was arrested. The officers "beat the shit out of [defendant]."

Defendant never returned to live in the family home, and he did not gather his possessions due to a restraining order being in place. Defendant moved into the house Munoz offered him. The only amenities in the house were a bed, radio, and recliner. The house did not have a refrigerator or other appliances. Deputies suggested defendant should protect himself because the people breaking into the house were likely drug addicts. Defendant borrowed the gun from Munoz in mid-October. Defendant had never owned a gun and did not know how to operate a gun. Munoz showed defendant how to use the gun. Defendant carried the gun in his vehicle, so it would not be stolen during a break-in. Defendant loaded the gun when a man came to the house at 3:00 a.m. asking for money. Defendant kept the gun loaded.

During the second week of November, the furnace at defendant's house stopped working, so defendant began using the fireplace. It was "freezing" inside the house. Defendant slept on a recliner next to the fireplace. Defendant did not have wood to burn, so would "[b]urn whatever would burn." Defendant closed all the doors and windows when heating the house, and only left the fireplace area to use the restroom.

Defendant called the victim multiple times, in order to insure the children were being supervised while the victim was at work. Defendant offered to help watch the children, but the victim often refused his offers. When defendant visited with his two

youngest daughters at the home he rented, his daughters would sometimes nap in front of the fireplace on a blanket.

On the night of November 29, defendant burned scrap wood and newspaper in the fireplace at his rented house. There was also a "log lighter or pilot light inside the fireplace," which defendant left running to generate heat. On the morning of November 30, defendant did not have any material to burn so he "was just using the pilot or the log burner or whatever." Defendant contacted the victim about getting his coat because it "was extremely cold in the house." Defendant was surprised when the victim informed him that she planned to introduce their daughters to Flores.

Defendant spoke to Munoz that morning and told Munoz that he needed to return Munoz's gun to him. In the afternoon, at approximately 3:00, defendant spoke to Leanna Bradley (Bradley), who owned the home defendant rented. Defendant asked Bradley how long she would wait before introducing a boyfriend to her son. Bradley responded that "it would take [her] awhile." Defendant told Bradley he might have to move if his financial situation did not improve. Defendant told Bradley his daughters were scared to be inside his rented house because they believed the house was haunted. Defendant asked Bradley if anyone died inside the home. Bradley responded that a woman passed away in the house. Defendant said, "[O]h, that is who has been talking to me," or "Oh, that is the voices I have been hearing." Bradley thought defendant's comment was "kind of strange and maybe he was joking around."

When defendant, the victim, and Clarke arrived at the restaurant on November 30, defendant asked the victim for his coat. The victim retrieved the coat and asked

8

defendant, "'What about the things for the girls?'" Defendant walked to the back of his truck and lifted the tailgate in order to get the items for his daughters, but picked up the shotgun instead. Defendant held the gun at the level of his waist. Defendant recalled "the gun going off," but did not remember shooting the victim. Defendant did not recall saying anything to the victim.

Defendant did not recall driving to Munoz's residence, but he remembered being there. Defendant left the shotgun outside Munoz's house. Defendant drove toward Temecula and parked at a winery. Defendant was "[t]rying to figure out had happened." Defendant handwrote a will because he assumed law enforcement officers would kill him due to defendant shooting the victim. In the will, defendant left three vehicles and $3 to his three eldest daughters, and insurance policies to his two youngest daughters. Defendant left the insurance for his youngest daughters because he is "closer to them." Defendant also left items or information to his mother, brothers, children from prior relationships, and ex-wife.

Defendant called his mother, Mary Frank (Mary). When Mary answered the phone, defendant was "crying and praying to God and just out of it." When the call ended, Mary called Clarke. Defendant then called Mary again. Mary told defendant that she learned defendant shot the victim. Defendant "was still crying and praying and he said 'Yes.'" Defendant was speaking clearly; however, Mary thought he "kind of sounded out of it," because he kept crying, praying, and "couldn't get ahold of himself." Mary suggested defendant contact law enforcement and confess.

9

Defendant called a colleague, Steve Gronlund (Gronlund), and then drove to Gronlund's house. Gronlund's wife answered the door. She had to ask defendant five times how he was doing before he responded. Defendant surrendered to law enforcement officers at Gronlund's house. Defendant was shackled and placed in a holding cell. Two deputies tried to "get [defendant's] attention" in the cell, but defendant did not have the strength to hold his head up and talk. Defendant was sweating profusely, his heart was beating rapidly, he was struggling to breathe, nauseous, and suffering chest pains. A deputy noticed defendant urinated on himself. Defendant complained of blurred vision or feeling dizzy. Defendant lost consciousness.

Paramedics took defendant to a hospital sometime between 10:00 p.m. and 11:00 p.m. Defendant's condition began improving in the ambulance. Defendant "felt considerably better" at the hospital. Dr. Bohdan Olesnicky (Olesnicky) treated defendant. Olesnicky examined defendant for a "cardiac condition, a pneumonia, or toxic substance ingested," due to defendant complaining of chest pains. Olesnicky also considered the possibility that defendant was suffering from anxiety or a psychiatric illness. Defendant told Olesnicky that he was feeling anxious and "'did not know what came over him.'" Blood tests showed a minimal amount of alcohol in defendant's blood. Olesnicky concluded defendant suffered an anxiety attack. Olesnicky did not test defendant's blood for carbon monoxide poisoning because Olesnicky "had no indication" of such poisoning.

Defendant was transported back to the sheriff's station at approximately midnight. Defendant explained that he never intended to harm the victim and on

November 30 "the one thing [he] wanted more than anything in the world" was his family. When Bradley went to the house after defendant's arrest, she noticed that defendant appeared to have been in the middle of preparing a meal when he left and Christmas music was playing on the radio. Bradley saw a recliner was a few feet away from the fireplace.

D.     EVIDENTIARY RULINGS

In the "Facts" section of defendant's written motions in limine, defendant asserted "he may very well have been suffering from carbon monoxide poisoning" at the time of the murder. In the prosecutor's motions in limine, the prosecutor moved the trial court to exclude evidence concerning defendant's possible exposure to carbon monoxide. The prosecutor asserted defendant planned to present the testimony of a psychologist, Stacey Wood, and a building inspector, Dale Feb.

The prosecutor argued that Feb's testimony was problematic because he examined the fireplace in defendant's rental home in April 2011, after other people had been living in the home for more than four months. Feb found the fireplace released high levels of carbon monoxide, but the prosecutor asserted Feb did not know the condition the fireplace was in on November 30 and therefore "has no idea what levels of carbon monoxide the defendant may or [may] not have been exposed to."

The prosecutor asserted Wood's testimony was problematic because her opinion was based on the foregoing faulty home inspection. The prosecutor explained Wood would testify that "defendant tested normally on her neuropsychological tests," so he may have been exposed to carbon monoxide on November 30.

11

Prior to opening statements, the trial court held a hearing on the motion. The prosecutor argued the carbon monoxide evidence would be "pure speculation." Defendant's trial counsel argued Wood would explain how the symptoms defendant suffered before, during, and after the murder were consistent with carbon monoxide poisoning. Wood would further explain how carbon monoxide acts as a neurotoxin. Defendant asserted Wood could not conclude defendant suffered carbon monoxide poisoning at the time of the murder, but that defendant's symptoms were consistent with carbon monoxide poisoning. In regard to Feb, defendant argued that photographs of the fireplace taken "shortly after" the murder reflect the fireplace was in the same condition as the day Feb inspected it in April 2011.

The prosecutor again argued that the problem was a lack of evidence concerning the condition of the fireplace on November 30. The prosecutor noted new tenants moved into the house on December 11 and were burning wood in the fireplace, so there was no way to know what happened to the fireplace between November 30 and the day in January when the photographs of the fireplace were taken.

Defendant's trial counsel offered Bradley's testimony. Counsel contended Bradley would say there was a problem with the fireplace and the gas company "capped off" the log lighter in the fireplace. Counsel asserted the carbon monoxide evidence was relevant because it served as a "complete defense" and also could reflect a heat of passion killing due to involuntary intoxication.

The trial court explained that it was having difficulty with "whether or not [Feb] can testify as to the existence on the date in November of this defect, it was operating in

12

that fashion." The trial court said it wanted to hear Feb's testimony. Defense counsel made an offer of proof; counsel gave the court Feb's written report. After reading the report the trial court said, "The statements of your expert in the document doesn't say that there was this condition in existence at the time." The trial court continued, "Then his final conclusion, it says he could have been exposed to carbon monoxide. That's not a definitive—that's just pure speculation. And it's sometime after the fact as well." The trial court also faulted Feb's report for not measuring the parts per million in different areas of room; Feb only measured directly over the fireplace. The trial court concluded, "If your witness, Mr. Feb, testified to what he put in that report, it would be speculation and it would not then be relevant." As a result, the trial court held the carbon monoxide evidence would be more prejudicial than probative under Evidence Code section 352.

Defense counsel asked the trial court for leave to file a *Trombetta* motion.[3] Counsel asserted, "the officers knew that [defendant] may[] have poisoned himself," so the blood should have been retained or tested. The prosecutor asserted, "the blood was obtained by workers at the hospital, not law enforcement. And the officers had no idea what he was being tested for. He was being taken to the hospital for an okay-to-book." Defense counsel argued that the blood sample was the evidence that would show whether defendant was exposed to carbon monoxide on November 30.

---

[3] *California v. Trombetta* (1984) 467 U.S. 479, 488–489 (*Trombetta*).

13

Defense counsel then returned to the carbon monoxide defense as a whole. Counsel asserted the prosecutor's motion was premature, and that through witnesses at trial the defense would lay a foundation for the experts' testimonies. The trial court responded, "[T]hat's entirely up to you. I'm not saying you cannot do it."

When court resumed following the lunch recess, defendant presented the trial court with "a motion for sanctions based on the *Trombetta* case." Defense counsel explained the hospital destroyed blood samples within one day to one week of collection. Defendant was arraigned on December 3, defense counsel was formally appointed on December 17, and defense counsel did not learn of the possible poisoning or hospital visit "until much later." As a result, defense counsel requested charges be dismissed or that the prosecutor be barred from arguing the carbon monoxide evidence was speculative because the defense was forced to speculate by the prosecution's failure to preserve evidence. Counsel asserted deputies did not diligently perform their duties because they should have secured a blood sample from defendant since they suspected he may have been poisoned.

The prosecutor asserted a paramedic suspected defendant might have been poisoned, but that it would be "completely inappropriate to assume" a deputy thought defendant may have been poisoned. Additionally, the prosecutor asserted the hospital collected defendant's blood, so the sheriff's department "was under no obligation to retain a sample of [defendant's] blood." The prosecutor contended the doctor diagnosed defendant as suffering a panic attack so the deputies had no reason to know evidence needed to be obtained from the hospital.

14

The trial court remarked that a transcript of a belt recording did not reflect who was speaking about defendant possibly being poisoned—deputies or paramedics. The trial court asserted defendant's motion would be "stronger" if it could be shown that the officers were speaking. Nevertheless, the court concluded the transcript reflected deputies were likely involved in a conversation with paramedics and therefore "there is a basis for [defendant's] motion," because the deputies would have known about the possible poisoning.

The prosecutor then argued that assuming the deputies knew about the possible poisoning, there was still no evidence showing bad faith on the deputies' part in failing to obtain a blood sample. Additionally, the prosecutor argued that it was speculation as to whether the blood sample would have been exculpatory in regard to carbon monoxide levels. Defense counsel conceded he was "not alleging . . . bad faith," which "would require dismissal." Rather, counsel was asserting a "slack investigation . . . was conducted in this case," and therefore an instruction about the evidence should be given to the jury. Defense counsel suggested the trial court instruct the jury that "the blood samples were not kept in regards to this case."

The prosecutor disagreed with defense counsel's interpretation of the *Trombetta* law and asserted dismissal would not be the remedy even if there were bad faith. The prosecutor contended defendant needed to show the blood sample was in the deputies' possession, the sample was destroyed by the deputies, it was apparent the sample was exculpatory when it was destroyed, and there was bad faith on the part of the deputies.

The prosecutor asserted that since there was not bad faith, defendant was not entitled to a remedy.

The trial court concluded that the exculpatory nature of the blood sample was not obvious, because defendant was ultimately diagnosed with suffering an anxiety attack. Accordingly, the trial court found there was not a *Trombetta* violation and denied defendant's motion.

Defense counsel informed the trial court Feb "would be able to say for certain that there was carbon monoxide in the room," because the fireplace was in the same condition prior to the murder. Counsel asserted defendant, Bradley, the defense investigator, and the tenants who moved into the home after the murder could all testify about the condition of the fireplace. Wood could testify about the symptoms associated with carbon monoxide poisoning, so the jury could make a reasonable inference about whether defendant was involuntarily intoxicated. Counsel analogized the situation to a defendant who is accused of driving under the influence, but refuses testing.

The trial court concluded the evidence was still "too speculative" and lacked foundation. However, the trial court permitted defense counsel to raise the motion again "down the road." During a recess in the midst of defendant's testimony, defense counsel asked the court to consider holding an Evidence Code section 402 hearing on Feb's and Wood's testimonies. Counsel asserted defendant's Sixth Amendment rights were being violated because he was being prevented from presenting a complete and meaningful defense.

16

The trial court noted it had read Feb's report and concluded Feb's testimony would be speculation. Defense counsel argued defendant testified to burning newspaper in the fireplace, which Feb found produces "extremely high levels of carbon monoxide." The trial court found no reason to change its prior ruling because the evidence was "just pure speculation." The trial court denied defendant's request.

## DISCUSSION

### A. DEFENSE

Defendant asserts he laid a sufficient foundation to present Feb's and Wood's testimonies, and therefore the trial court erred by excluding the evidence. We disagree.

Expert testimony must be based upon the facts shown by the evidence. (*People v. Vang* (2011) 52 Cal.4th 1038, 1045-1046.) An "'expert's opinion may not be based "on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors . . . ."'" [Citation.]" (*Id.* at p. 1046.) The reason for these rules is apparent, in that "[e]xpert testimony not based on the evidence will not assist the trier of fact." (*Ibid.*) We review the trial court's evidentiary ruling for an abuse of discretion. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 819.)

The trial court's decision was reasonable because the evidence presented at trial did not support an inference that defendant may have been suffering from carbon monoxide poisoning at the time of the murder. The record reflects that in the hours before the murder, defendant (1) spoke to Munoz about returning the shotgun; (2) spoke to Bradley about needing to move due to financial hardship; while speaking to Bradley

17

defendant made a comment about talking to a ghost, but Bradley thought defendant was joking; (3) prepared food for himself; and (4) drove to a gas station and a restaurant.

There was nothing presented at trial indicating defendant suffered involuntary intoxication prior to the murder. The record reflects defendant accomplished ordinary tasks in an ordinary manner. Given this evidence, the trial court could reasonably conclude expert testimony about defendant being under the influence of carbon monoxide lacked foundation because the testimony would not have been based on the evidence presented. Accordingly, we conclude the trial court did not err.

Defendant contends he made "substantial foundational showings based upon the circumstantial evidence of carbon monoxide poisoning." To support this assertion, defendant cites (1) Feb's report, (2) trial counsel's offer that Feb would say the fireplace was in substantially the same condition as it was on November 30, (3) defendant's testimony about how he used the fireplace, and (4) Bradley's testimony about the condition of the fireplace.

Defendant's argument is not persuasive because he appears to be using the expert's opinion about the condition of the fireplace as the foundation for introducing the expert's testimony. However there is nothing making Feb's report or Wood's information about carbon monoxide poisoning relevant in this case because there is nothing indicating defendant was impaired at the time of the murder or in the hours prior to the murder. The expert testimony would seem out of place given the state of the evidence because there was nothing supporting a finding of intoxication. Thus, expert opinion testimony about intoxication would not have been helpful to the jury.

18

Next, defendant analogizes this case to a "DUI" situation wherein the driver refuses medical tests and the issue of intoxication must be proven through circumstantial evidence. Defendant's analogy is not persuasive because in a DUI case there would typically be evidence of the defendant swerving or smelling of alcohol prior to an expert testifying. In this case, there is nothing indicating defendant was intoxicated prior to the murder.

## B. CURATIVE JURY INSTRUCTION

Defendant contends the trial court erred by not instructing the jury that the State had an obligation to preserve the blood sample. We disagree.

"The standard of review of a trial court's determination that evidence is or is not sufficiently exculpatory under *Trombetta* and *Youngblood*[4] is unsettled, and it may depend on the extent of the inquiry a court takes before ruling on a *Trombetta* motion." (*People v. Velasco* (2011) 194 Cal.App.4th 1258, 1262.) For the sake of caution, we will apply the de novo standard of review. (*U.S. v. Cooper* (9th Cir. 1993) 983 F.2d 928, 930-931 [applying de novo standard of review].)

"Under *Trombetta* and *Youngblood*, 'Law enforcement agencies must preserve evidence only if it possesses exculpatory value "apparent before [it] was destroyed," and not obtainable "by other reasonably available means." [Citations.] The state's responsibility is further limited when the defendant challenges the failure to preserve evidence "of which no more can be said than that it could have been subjected to tests"

---

**4** *Arizona v. Youngblood* (1988) 488 U.S. 51, 57-58 (*Youngblood*).

19

that might have helped the defense.  [Citation.]  In such a case, unless the defendant can show "bad faith" by the police, failure to preserve "potentially useful evidence" does not violate his due process rights.'  [Citation.]"  (*People v. Velasco*, *supra*, 194 Cal.App.4th at p. 1262.)  "Once the defendant has proved a loss of material evidence, the trial court has discretion to impose appropriate sanctions, including fashioning a suitable cautionary instruction.  [Citations.]"  (*People v. Medina* (1990) 51 Cal.3d 870, 894.)

In the instant case, defendant would need to show bad faith in relation to the destruction of the blood sample; defendant has only asserted the blood could have been subjected to carbon monoxide screening, which may have resulted in the sample having exculpatory value.  Defendant conceded at the trial court that he was not asserting the deputies acted in bad faith by failing to preserve the sample.  Since defendant did not meet the first step in the process—showing a bad faith loss of material evidence, the trial court had no reason to consider sanctions.  In other words, there needed to be a bad faith finding before the trial court could properly consider the jury instruction issue.  Since defendant conceded the bad faith issue, the trial court did not err.

Defendant asserts the trial court erred because there is "little question that the blood sample 'possessed an exculpatory value.'"  Defendant's argument is not persuasive because defendant concedes the blood was not tested for carbon monoxide poisoning.  Thus, defendant can only assert the blood could have been subjected to tests, which may have revealed exculpatory value.  As a result, defendant must show bad faith on the part of the deputies, but defendant conceded the issue at the trial court.

20

Next, defendant contends that, even without a showing of bad faith under *Trombetta*, defendant was entitled to a curative instruction due to "the loss of constitutionally material evidence" resulting in violations of his "rights to due process and fair trial." Defendant's argument is not persuasive because *Trombetta* is a due process case. (*Trombetta*, *supra*, 467 U.S. at pp. 480-481.) In support of his argument, defendant cites *People v. Melton* (1988) 44 Cal.3d 713, 750, which contains a citation to *Trombetta* and discusses the law presented in *Trombetta*. Accordingly, we conclude our *Trombetta* analysis would not differ from a due process/fair trial analysis.

### C. HEAT OF PASSION JURY INSTRUCTION

#### 1. *PROCEDURAL HISTORY*

##### a) CALCRIM No. 522

Defendant requested the trial court instruct the jury with an "imperfect heat of passion" instruction. The prosecutor asserted defendant was improperly modifying the provocation instruction to combine imperfect self-defense with heat of passion. (CALCRIM No. 522.) The prosecutor conceded defendant could have the jury instructed with the original version of CALCRIM No. 522, but not a modified version that combined two different theories. The original version of the instruction explains how provocation may reduce first degree murder to second degree murder or manslaughter. (CALCRIM No. 522.) The modification would have allowed for a heat of passion finding based upon a subjective standard, rather than an objective one.

The prosecutor argued there was no evidence the victim verbally or physically provoked defendant to act rashly on the day of the murder. The prosecutor asserted the

victim "was just standing there with a coat," and the information about Flores meeting defendant's daughters was exchanged eight hours prior to the murder so there could not be a provocation finding.

Defense counsel asserted the jury could find defendant was provoked because (1) defendant saw Clarke driving to the restaurant, and he was supposed to teach Clarke how to drive, so that experience was taken from him; (2) the victim "showed no remorse in regards to teaching Clarke how to drive"; (3) the victim told defendant she would be introducing Flores to defendant's daughters; and (4) defendant's overall life was stressful with his in-laws moving into the family home, defendant being forced to leave the family home, defendant living in fear at his rental home, defendant living with very few supplies in the rental home, and defendant being told his older children did not want to visit him. Counsel argued all these issues could be connected to the victim and the victim teaching Clarke how to drive was the last "straw."

The trial court found that none of the fear, disappointment, frustration, loss, or stress experienced by defendant constituted provocation, even if they were all combined. The trial court concluded it would instruct the jury on the lesser included offense of voluntary manslaughter, but not provocation. (CALCRIM No. 522.)

### b) CALCRIM No. 570

Defense counsel moved the trial court to instruct the jury with a modified version of CALCRIM No. 570, which concerns heat of passion voluntary manslaughter. Counsel asserted there was problematic burden-shifting language in the original version of the instruction, which counsel attempted to fix with modifications. The prosecutor

asserted it would be inappropriate to change the language of the CALCRIM instruction. The trial court found defendant was attempting to "stress portions of CALCRIM 570 that [were] not intended to be stressed." The trial court declined to modify the instruction.

Defense counsel asserted the same evidence detailed *ante*, which would support a finding of provocation, would also support a heat of passion finding. The prosecutor asserted the victim's mere presence was insufficient to support a heat of passion finding. The prosecutor asserted defendant and the victim were civil in making arrangements to meet and there was nothing indicating the victim said or did anything provocative at the restaurant parking lot.

The trial court ruled it would instruct the jury on heat of passion manslaughter. (CALCRIM No. 570.) The trial court commented that the evidence supporting a heat of passion finding was "extremely weak, but there is enough evidence."

2.    *ANALYSIS*

Defendant contends the trial court erred by not instructing the jury that "even if the provocation was insufficient to *objectively* induce a heat of passion for purposes of manslaughter, a defendant's *subjective* heat of passion response to provocation could reduce the crime from first to second degree murder by negating the existence of premeditation and deliberation."

We review jury instructions de novo. (*People v. Jackson* (2010) 190 Cal.App.4th 918, 923.) "We determine the correctness of the jury instructions from the entire charge of the court, not from considering only parts of an instruction or one particular

23

instruction. [Citation.] The absence of an essential element from one instruction may be cured by another instruction or the instructions taken as a whole. [Citation.]" Further, in examining the entire charge we assume that jurors are "'"'"intelligent persons and capable of understanding and correlating all jury instructions which are given."' [Citation.]" [Citations.]' [Citation.]" (*People v. Smith* (2008) 168 Cal.App.4th 7, 13.)

"The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request. [Citations.]" (*People v. Burney* (2009) 47 Cal.4th 203, 250.) In *People v. Avila* (2009) 46 Cal.4th 680, our Supreme Court concluded a trial court did not err by failing to instruct the jury that provocation could affect the degree of murder. The Supreme Court wrote, "'Although the court did not use the word "provocation" in regard to the degree of murder, it did instruct on "heat of passion." It told the jury that for the killing to be first degree murder, it must not have been committed "under a sudden heat of passion or other condition precluding the idea of deliberation." [Citation.] By specifically referring to heat of passion and generally referring to any other condition precluding deliberation, the court fully instructed on the law relevant to the actual evidence.'" (*Id.* at pp. 707-708.)

In the instant case, the trial court instructed the jury that "defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with premeditation if he decided to kill before completing the acts that caused death." (CALCRIM No. 521.)

24

The court explained that if the prosecution did not prove these elements or the alternate theory of lying in wait, then the murder would be second degree.

In regard to heat of passion, the trial court informed the jury that it required defendant to have "acted rashly and under the influence of intense emotion that obscured his reasoning or judgment." (CALCRIM No. 570.) The trial court further explained, "Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection." (CALCRIM No. 570.) The instruction further set forth the rule that a heat of passion finding is not supported if a person could have "'cool[ed] off' and regain[ed] his clear reasoning and judgment." (CALCRIM No. 570.) In CALCRIM No. 521, the jury was informed, "A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated."

Given the totality of the instructions, the jury was adequately instructed that subjective factors affecting defendant's decision-making skills would preclude a first degree murder verdict, similar to the situation in *People v. Avila*, *supra*. From the instructions, an intelligent juror, correlating the instructions, would understand that premeditation and deliberation require clear reasoning and judgment—that if the defendant's thinking is obscured by emotion, then the premeditation and deliberation findings would be problematic. Accordingly, when reviewing the instructions as a whole, we conclude the trial court did not err because the instructions explained the relevance of a subjective heat of passion response to the jury as it relates to the degrees of murder.

Defendant asserts the foregoing alleged instructional error was further complicated by the trial court not defining second degree murder for the jury. Defendant's argument is not persuasive because the trial court defined murder for the jury, explained how a killing qualified as first degree murder, and then explained that "all other murders are of the second degree." The trial court's instructions about second degree murder were reasonable. The instructions set forth the concept that if the definition of murder was met, but the first degree findings were not supported, then the murder would be second degree. Accordingly, we find defendant's argument to be unpersuasive.

D.    RESTITUTION

1.    *PROCEDURAL HISTORY*

Defendant's probation report reflects that, after the murder, the victim's and defendant's three eldest daughters were residing with an uncle outside of California while the two youngest children were residing with an aunt in California. The report further reflects a request by the prosecutor that defendant be ordered to pay $82,583.98 because that amount was "paid out by the victim compensation and government claim board." The probation officer recommended defendant "[p]ay restitution of $82,583.98, plus [an] additional amount to be determined by the Probation Department[ and p]ay interest on restitution at 10% per annum. [§ 1202.4, subd. (f)(3)(G)]."

At defendant's sentencing hearing, the following exchange took place:

The Court: "There's also some restitution that's already been afforded the family of the victim and it reads $82,583.98. The question I have is does that—I'll order that restitution be paid by the defendant.

"[Defense Counsel]: I would ask that it be left in an amount to be determined because it looks like this is not a final amount, your Honor.

"The Court: No, it doesn't. But that amount appears to be up to this point at least per probation's calculations. And then the defendant is to pay any amount in addition to that to be determined by probation."

Later in the hearing, the following discussion took place:

[Prosecutor]: "And, your Honor, just for clarification, it didn't state this in the probation officer's report, the restitution amount listed by the Court, that's actually already been paid by the Victim Compensation Government Claims Board so the restitution should be ordered to be paid to them.

"The Court: To whomever it's due.

"[Prosecutor]: Right.

"The Court: That will be ordered. I indicated that it is in fact—if it weren't paid by the Victim Restitution Fund, it would be paid directly to the named victim.

"[Prosecutor]: Right.

"The Court: But since it's been paid now, then they owe that back to the Victims Restitution Fund as a third party."

27

## 2. *ANALYSIS*

Defendant contends the trial court erred by imposing a restitution fine in the amount of $82,583.98 because the record does not support restitution in that amount. (Former § 1202.4, subd. (f) [eff. Sept. 27, 2010].)  The People assert defendant forfeited this contention by failing to raise it at the trial court.

A defendant can forfeit a claim concerning a restitution fine by failing to raise the issue in the trial court.  (*People v. Nelson* (2011) 51 Cal.4th 198, 227; *People v. Gamache* (2010) 48 Cal.4th 347, 409.)  At the trial court, defendant did not request a hearing to dispute the amount of the fine (§ 1202.4, subd. (f)(1)), nor did he raise an objection concerning the lack of evidence submitted in support of the fine (§ 1202.4, subd. (f)(4)(B)).  Given that the restitution issue was not raised below, we conclude defendant forfeited the issue for appeal.

Defendant asserts he did not forfeit the alleged error for appeal because substantial evidence issues are an exception to the forfeiture rule.  Out of caution, we will address the merits of defendant's contention.  "'When the probation report includes a discussion of the victim's loss and a recommendation on the amount of restitution, the defendant must come forward with contrary information to challenge that amount. [Citation.]'  [Citations.]"  (*People v. Collins* (2003) 111 Cal.App.4th 726, 734, but see *People v. Harvest* (2000) 84 Cal.App.4th 641, 653 [a probation report "may satisfy notice requirements for due process . . . but it cannot take the place of evidence"].)

The probation report reflects the Victim Compensation and Government Claims Board paid $82,583.98 to the victims.  Typically, "[t]he amount of assistance provided

28

by the Restitution Fund shall be established by copies of bills submitted to the California Victim Compensation and Government Claims Board reflecting the amount paid by the board" and what services were provided. (§ 1202.4, subd. (f)(4)(B).) However, as set forth *ante*, a probation report can be sufficient, if there is not contrary evidence offered by the defendant. (*People v. Collins*, *supra*, 111 Cal.App.4th at p. 734.)

In the instant case, the probation report reflects a recommended restitution amount of $82,583.98. Defendant did not present any evidence that challenged this amount. The trial court could reasonably infer that there were expenses associated with the children moving given the evidence that five children were left without parents to care for them, three of the children moved out of state to live with a relative and two of the children moved within the state to live with a different relative.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____
J.

We concur:

HOLLENHORST _____
Acting P. J.

McKINSTER _____
J.